**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

**Case no.: 0:25-cv-61290-LEIBOWITZ**

ARMAN MOTIWALLA, an individual,

     Plaintiff,

v.

INNOVATIVE PARTNERS L.P., a Texas
limited partnership,

     Defendants.

_____/

INNOVATIVE PARTNERS L.P., a Texas
limited partnership,

     Counter-Plaintiff,

v.

ARMAN MOTIWALLA, an individual
and REIA & CO LLC, a Delaware limited
liability company,

     Counter-Defendants.

_____/

**DEFENDANT / COUNTER-PLAINTIFF INNOVATIVE PARTNERS L.P.'S**
**AMENDED ANSWER AND AFFIRMATIVE DEFENSES TO**
**PLAINTIFF'S VERIFIED AMENDED COMPLAINT AND COUNTERCLAIM**

Defendant, INNOVATIVE PARTNERS L.P. ("Innovative"), through undersigned counsel,

hereby files its Answer and Affirmative Defenses to Plaintiff, ARMAN MOTIWALLA's

("Plaintiff" or "Motiwalla") Verified Amended Complaint [DE 15] (the "Amended Complaint").

In response to the correspondingly numbered paragraphs of the Amended Complaint, Innovative

answers as follows:

**CAUSES OF ACTION**

1.      Admitted that this purports to be an action under ERISA and the FWA; however, denied that Plaintiff is entitled to such relief.

**PARTIES**

2.      Admitted that Plaintiff is an individual, resident of Florida, that Plaintiff served as Chief Operating Officer of Innovative, and that venue is proper; however, Innovative denies that Plaintiff was a participant and/or beneficiary of Innovative's ERISA health benefit plans as defined under 29 U.S. § 1002, and further denies that Plaintiff was a person protected under 29 U.S.C. § 1140 for engaging in activity related to the reporting of ERISA plan violations.

3.      Admitted that Innovative is a Texas limited partnership that has its principal place of business located in Coral Springs, Florida.  The remaining allegations in this paragraph are denied.

**JURISDICTION AND VENUE**

4.      Admitted for jurisdictional purposes only.

5.      Admitted for venue purposes only.

**GENERAL ALLEGATIONS**

6.      Admitted only that Innovative marketed and provided defined health benefit plans to the public.  Denied that Innovative administered or even offered ERISA plans for its own employees; in fact, any employees of Innovative that had health insurance procured their own directly from third parties.  The remaining allegations in this paragraph are denied.

7.      Denied.

8.      Admitted only that Defendant began providing services to Innovative in or around April or May 2023, was given the title of Chief Operating Officer, and had discretionary decision-

making authority with respect to selection, implementation and oversight of merchant payment processing for Innovative. The remaining allegations in this paragraph are denied.

9. Admitted only that Defendant was given the title of Chief Operating Officer beginning in or around April or May 2023, and was given a company email address, office space and administrative support. Denied that Innovative administered or even offered ERISA plans for its own employees; in fact, any employees of Innovative that had health insurance procured their own directly from third parties. The remaining allegations in this paragraph are denied.

10. Admitted.

11. Admitted only that in early 2023 Plaintiff was operating his own independent health insurance brokerage and that Ahmed Shokry ("Shokry") asked Plaintiff to work with Innovative, including to help setting up Innovative's merchant processors and protocols. The remaining allegations in this paragraph are denied.

12. Denied.

13. Denied. At all times material, Plaintiff continued to operate his own sales room for health benefit plans.

14. Denied.

15. Denied.

16. Admitted only that Plaintiff did, in fact, execute a Confidential Information and Invention Assignment Agreement dated November 15, 2024 as a "Service Provider" to Innovative. The remaining allegations in this paragraph are denied.

17. Denied.

18. Admitted only that Innovative did provide Plaintiff with office space and administrative infrastructure to perform services for Innovative. The remaining allegations in this

3

paragraph are denied.

19.    Denied.

20.    Denied.

21.    Denied.

22.    Denied.

23.    Admitted only that the California Department of Insurance issued a Cease-and-Desist Order against Innovative in or around June 2025.  Incidentally, the issuance of that order was caused by the fraudulent and deceptive sales practices of Plaintiff and his girlfriend, Madison Bounahra, while they were selling plans for Innovative through their own separate sales rooms. Without knowledge as to whether Plaintiff is cooperating with any regulatory authority, therefore denied.   The remaining allegations in this paragraph are denied.

24.    Denied.

25.    Denied.

26.    Denied.

### COUNT I – VIOLATION OF ERISA – RETALIATION

27.    Innovative incorporates and realleges its answers in paragraphs 1 through 26 above as though fully set forth herein.

28.    Denied.

29.    Denied.

30.    Denied.

31.    Denied.

32.    Denied.

33.    Denied.

## COUNT II – VIOLATION OF FLORIDA STATUTE 448.102: FLORIDA'S PRIVATE WHISTLEBLOWER ACT

34. Innovative incorporates and realleges its answers in paragraphs 1 through 26 above as though fully set forth herein.

35. Denied.

36. Denied.

37. Denied.

38. Denied.

39. Denied.

40. Denied.

41. Denied.

42. Denied.

43. Denied.

## GENERAL DENIAL

Innovative denies each and every allegation in the Amended Complaint which is not expressly admitted above.

## AFFIRMATIVE DEFENSES

1. <u>First Affirmative Defense</u>: Plaintiff lacks statutory standing to bring anti-retaliation claims against Innovative under Fla. Stat. § 448.102 (the "FWA") or the Employee Retirement Income Security Act of 1974 ("ERISA") because, at all times material, Plaintiff was not an employee of Innovative under applicable law.  Indeed, Plaintiff insisted to be engaged, classified and treated as an independent contractor of Innovative through a Delaware limited liability company called Huriya LLC ("Huriya"), which, upon information and belief, was and is owned or controlled by Plaintiff and/or his girlfriend, Madison Bounahra.  Plaintiff specifically insisted on

this arrangement because, according to Plaintiff, he was going through a separation and divorce from his wife at the time, Cynthia Scanlon, and he wanted to hide his compensation from her to avoid paying additional child support. A final judgment dissolving their marriage was ultimately entered in March 2024. *See Motiwalla v. Scanlon*, Palm Beach County, Florida Circuit Court case no. 50-2023-DR-005624-XXXX-SB. All payments from Innovative for Plaintiff's services were made to Huriya, as required by Plaintiff, and appropriate IRS Form 1099's were issued by Innovative to Huriya to reflect those payments.

Pursuant to the applicable provisions of ERISA, to bring a civil action as a "participant" under 29 U.S.C. § 1132(a)(1), as Plaintiff purports to do here, Plaintiff must have been an employee or a member of an employee organization. *See* 29 U.S.C. § 1002(7) (defining "participant" for ERISA purposes). Likewise, to bring a civil action for retaliation under the FWA, as Plaintiff purports to do here, Plaintiff must have been an employee. *See* Fla. Stat. § 448.102 ("An employer may not take any retaliatory personnel action against an *employee*…") (emphasis added); Fla. Stat. § 448.103(1)(a) ("An *employee* who has been the object of a retaliatory personnel action in violation of this act may institute a civil action …") (emphasis added). "The term [employee] does not include an independent contractor." Fla. Stat. § 448.101(2). Because Plaintiff was not an employee of Innovative, Plaintiff's claims are barred.

2. Second Affirmative Defense: Plaintiff's ERISA claim fails because, even if Plaintiff could establish that he was a *de facto* employee of Innovative, at all times material Innovative did not offer an employer-sponsored ERISA health plan to any of its own employees. Any employees of Innovative that had health insurance or another form of coverage for medical, dental, vision and the like, procured such policies or plans from third parties. Accordingly, Plaintiff could not possibly have "exercise[ed] any right to which he is entitled under the provisions

of an employee benefit plan" as contemplated under 29 U.S.C. § 1140, because he was not and could not possibly have been a participant, beneficiary, or fiduciary of any benefit plan sponsored by Innovative for its employees. He therefore lacks standing to bring this ERISA claim against Innovative. *See McKinnon v. Blue Cross and Blue Shield of Alabama*, 935 F. 2d 1187, 1193 (11th Cir. 1991) (holding that "29 U.S.C. § 1132, ERISA's civil enforcement provision, empowers only participants, beneficiaries, fiduciaries, and the Secretary of Labor to bring civil actions to enforce the Act.")

3.      <u>Third Affirmative Defense</u>: Plaintiff failed to notify or object to Innovative about any purported illegal activity, policy or practice of Innovative prior to his termination, in writing or otherwise, and thus did not allow Innovative a reasonable opportunity to correct the purported activity, policy or practice. Accordingly, Plaintiff's FWA claim is barred pursuant to Fla. Stat. § 448.103(c).

4.      <u>Fourth Affirmative Defense</u>: Innovative terminated its relationship with Plaintiff for legitimate, non-retaliatory reasons, and accordingly, Plaintiff's FWA and ERISA claims fail. More specifically, Innovative terminated its relationship with Huriya (and thus, Plaintiff), because Plaintiff caused Innovative significant financial losses and other damages through his grossly negligent, fraudulent, deceptive and otherwise bad faith acts and omissions, as set forth more fully in Innovative's Counterclaim below.

5.      <u>Fifth Affirmative Defense</u>: To the extent Plaintiff purports to allege a violation of the anti-retaliation provisions of ERISA with respect to the health benefit plans that Innovative administered for persons other than Innovative's own employees, Plaintiff failed to exhaust his administrative remedies under the plan documents before commencing this action, and therefore Plaintiff failed to satisfy a condition precedent.

6.      Sixth Affirmative Defense. Plaintiff's claims are barred by the *in pari delicto* doctrine.   To the extent that the finder of fact determines that Innovative violated ERISA as described by Plaintiff in paragraph 22 of the Amended Complaint – which Innovative strongly denies – any such violations were caused, in whole or in part, by Plaintiff's own acts or omissions.

7.      Seventh Affirmative Defense.   Innovative is entitled a set-off against any verdict in favor of Plaintiff for damages incurred by Innovative as a result of Innovative prevailing on any of its counterclaims against Plaintiff, set forth below.

[*Remainder of page intentionally left blank; Counterclaim Complaint begins on following page*]

**COUNTERCLAIM COMPLAINT**

Defendant Counter-Plaintiff, INNOVATIVE PARTNERS L.P. ("Innovative"), through undersigned counsel, hereby files its Counterclaim Complaint (the "Counterclaim") against Plaintiff / Counter-Defendant, ARMAN MOTIWALLA ("Motiwalla") and Counter-Defendant REIA & CO LLC ("Reia & Co."), and alleges as follows:

## I.   INTRODUCTION

1.      In his Amended Complaint, Motiwalla styles himself as a noble whistleblower, bravely standing up to supposed "ERISA violations."  The truth is far less flattering, and Motiwalla was no guardian of compliance.  He was a manipulative swindler, plain and simple, who exploited his position with Innovative for the benefit of himself and his girlfriend, Madison Bounahra ("Bounahra"). While he now pretends to have been fired for his supposed integrity, in reality he was busy committing credit card fraud and concealing a steady stream of customer complaints lodged against the "downline" sales rooms that he and Bounahra controlled through Counter-Defendant Reia & Co. and non-party Atropine and Associates LLC ("Atropine"), respectively. Not once before he was terminated – not a single time – did Motiwalla object to Innovative's principals about ERISA violations or anything remotely related to it.  His story is fiction, concocted to distract from the fact that the only wrongdoing here was his own.

2.      Innovative thus brings this Counterclaim because Motiwalla, while serving as Innovative's *de facto* Chief Operating Officer ("COO") and simultaneously running Reia & Co., abused his position of trust to line his own pockets.  He misrepresented his expertise, concealed customer complaints and regulatory actions, and rigged credit card processing by repeatedly charging declined or refunded transactions – all to generate unearned commissions for himself and Bounahra. He also failed to timely implement the most basic safeguards that, combined with his

credit card fraud, drove Innovative onto a credit card processing watch list.  Through fraud, conversion, and blatant breaches of duty and contract, Motiwalla and Reia & Co. caused Innovative millions in losses and left behind more than a million dollars in unpaid contractual obligations owed to Innovative.

## II.   PARTIES, JURISDICTION, AND VENUE

3.   Motiwalla is the Plaintiff in the underlying action and was, at all material times, a resident of Broward County, Florida, over 18 years of age and otherwise *sui juris.*

4.   Reia & Co. was, at all times material, a Delaware limited liability company with its principal place of business in Broward County, Florida.  Upon information and belief, its sole member is Motiwalla – a citizen of the State of Florida – and therefore Reia & Co is a citizen of the State of Florida for jurisdictional purposes.

5.   Reia & Co. is properly added as a counterclaim defendant in this action pursuant to Federal Rules of Civil Procedure 13(h) as well as 19 and/or 20.

6.   This Court has jurisdiction over this Counterclaim pursuant to 28 U.S.C. § 1367 because the claims asserted herein form part of the same case or controversy as the claims asserted in Plaintiff's Amended Complaint.

7.   This Court has personal jurisdiction over Reia & Co. because, at all times material, it was engaged in substantial and not isolated activity within this state, as contemplated under Fla. Stat. § 48.193(2), and/or because Reia & Co. breached a contract in this state by failing to make payment to Innovative in this state, as contemplated under Fla. Stat. § 48.193(1)(a)(7).

8.   Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a Motiwalla and Reia & Co reside in this District and because a substantial part of the events or omissions giving rise to the counterclaim occurred in this District and/or because the parties are subject to

personal jurisdiction here.

9.     Innovative has retained the undersigned law firm to initiate and maintain this action and is obligated to pay it a reasonable fee for its services in bringing this action, as well as all costs of suit.

10.     All conditions precedent to the filing and maintenance of this action have been fully performed, satisfied, or have otherwise occurred, or, in the alternative, such conditions have been waived or excused.

### III.     BACKGROUND

11.     As its name suggests, Innovative offers various innovative health care benefit plans ("Plans") to individuals ("Members") who might not otherwise desire or have access to traditional or affordable health insurance.  Innovative was founded by industry veteran Jimmy Sutton, who officially formed the company in November 2022 and quickly brought on his old colleague, Ahmed Shokry ("Shokry") to help him get things up and running.

12.     Sutton envisioned operating the company as a multi-level telephone sales organization and offering Innovative's Plans in multiple states.  Innovative would need an expansive sales force, startup capital, and regulatory and internal operational expertise.

13.     To scale quickly on the sales side, Innovative determined it would contract directly with third party sales agents who would operate rooms staffed with salespersons (a "Sales Room") through a corporate entity (a "Recruiter").  And Innovative expected that its Recruiters would, in turn, subcontract with its own sub-agents ("Downlines") and their respective Sales Rooms.  Sales Rooms would be tasked with enrolling Members into Innovative's Plans in exchange for percentage-based compensation (an "Incentive") calculated on Plan payments received from the enrolled Members ("Plan Fees").

14. Innovative also sourced the necessary funding to attract and retain its Recruiters, which was an expensive endeavor. Per industry standards at the time, Innovative offered Recruiters six (6) months of Incentives in advance on each newly enrolled Member. In other words, Innovative would prepay six (6) months of Incentive money up-front, upon sale, that the Recruiter had not yet earned, with the expectation that the Member would continue to participate in the Plan and pay Plan Fees for at least six (6) months – the break-even point.

15. With its sales plan solidified and funding secured, what Innovative really needed was someone to run and oversee the company's day-to-day operations. Because Innovative was operating a telephone sales-based business in a highly regulated industry across multiple states, this position required experience in credit card processing, customer dispute resolution, and regulatory compliance functions.

### A.   The Hiring of Motiwalla

16. Shokry began speaking with Motiwalla about joining Innovative as its chief operating officer. Shokry knew Motiwalla because he had worked with him previously in other ventures many years prior.

17. Over the course of approximately 45-60 days during October and November 2022, Shokry spoke with Motiwalla multiple times over the phone, at Innovative's office space located on University Drive in Coral Springs, Florida, and at Motiwalla's office space located on Commercial Boulevard in Ft. Lauderdale, Florida.

18. During these calls and in-person meetings, Motiwalla misrepresented himself to Shokry as having vast experience in relevant business operations, and, in particular, an expertise in credit card payment processing in highly regulated industries. Motiwalla touted his prior experience running a hemp / CBD company that processed credit card payments in a "card not

present" environment, like Innovative would. Motiwalla also touted his prior experience in the insurance industry, as he was already running Reia & Co as a sales room selling health benefit plans on behalf of a different organization.

19.     Based on Motiwala's representations and purported qualifications, Innovative offered him employment as Innovative's COO on a full-time basis.   Motiwalla agreed, but on two conditions.  First, he insisted to be treated and paid as independent contractor through a Delaware limited liability company called Huriya LLC ("Huriya"), which upon information and belief, was owned either by Motiwalla or his girlfriend, Bounahra.  Motiwalla insisted upon this arrangement due to an ongoing divorce from his then wife and insinuated that he needed to hide income from being uncovered in his divorce proceedings.   Second, Motiwalla insisted on continuing to operate Reia & Co, but as a Recruiter for Innovative.

20.     Motiwalla ultimately convinced Shokry that his continued operation of Reia & Co would not present a conflict of interest or distract from his duties as *de facto* COO of Innovative. Innovative thus agreed to Motiwalla's conditions due to his purported expertise and because of his prior relationship with Shokry.

21.     Motiwalla started working in this position in or about February 2023.

### B.     Motiwalla Botched Innovative's Credit Card Processing

22.     Motiwalla's primary initial task as *de facto* COO was to onboard credit card processors and implement Innovative's processing protocols. This was critical to Innovative's success because all, or virtually all, of Innovative's Members would typically pay their Plan Fees by providing a credit card number over the phone to the Sales Room, which processes the payment through Innovative's payment gateways.   Indeed, Innovative hired Motiwalla primarily for his purported expertise in this area.

23.     Because Innovative would operate in a "card not present" environment, in which the physical credit card was not present when a sale is processed, the risk of fraud and chargebacks is greater than in a more traditional retail environment in which physical credit cards are presented for payment.   Maintaining a chargeback frequency below the credit card processor's threshold is important for many reasons. Excessive chargebacks result in increased processing costs, increased chargeback reserves (*i.e.*, the percentage of transaction revenue that processor holds back from the merchant on a rolling basis to cover future chargebacks), termination from the processor's platform or, worse yet, being put on a MATCH list (more on that below).

24.     There are safeguards that can, and should, be put in place by merchants to reduce the risk of chargebacks or mitigate their attendant consequences. The first is to select the right processors.  Most "traditional" credit card processors – such as Fiserv or FIS, for example – are relatively risk adverse and prefer to service brick and mortar establishments where the card is physically presented for payment.  They have lower chargeback thresholds and are thus not well suited for "card not present" environments.  There are, however, plenty of "higher risk" processors that cater to online or telephone-heavy sales businesses, such as Innovative.  Those processors are used to higher chargeback ratios and, to compensate for that risk, do charge a higher processing fee and require larger reserves than traditional processors.   But those base-rate fees and reserve percentages pale in comparison to the punitive fees and reserves that a traditional processor imposes when chargebacks become excessive on their portals.

25.     The second safeguard is to enroll in rapid dispute resolution programs (an "RDR") offered by the payment networks such as Visa and Mastercard, which enable merchants to quickly (and often automatically) provide refunds to cardholders when a dispute is first initiated. Merchants can define rules for eligible disputes, and if a transaction meets these criteria, the RDR

triggers a refund before a formal chargeback process begins, which is beneficial for the merchant's chargeback ratios and operational costs, and improves the customer experience.  In turn, it keeps the merchant's credit card processing fees low and its reserve requirements at a reasonable level.

26.     Despite his claimed expertise in this area, Motiwalla initially onboarded traditional payment processors and failed to enroll in a single RDR. These were rookie mistakes – as Innovative would later learn from the processing consultant it engaged to fix Motiwalla's mistakes – and they would prove devastating to Innovative when it began sales activities in or about April 2023.

27.     Innovative's chargeback ratios and volume limits soon exceeded what these traditional processors could tolerate, so Innovative's cost to process transactions and reserve requirements increased substantially and ultimately resulted in Innovative's termination from their processing platforms.  In the summer of 2023, three processors terminated Innovative or requested an account hold due to elevated risk.  Those terminations, in turn, left Innovative with a short and, more importantly, negative, processing history, which made it difficult to secure replacement processors at a reasonable cost.

28.     Rather than own up to his mistakes and incompetence, he brushed them under the rug and assured Shokry and the rest of the Innovative team that everything was fine and he was handling it.  What Motiwalla did instead was onboard new processors at even higher costs without informing Innovative of the devastating consequences.   To put things into context, if Motiwalla had truly been the expert he purported to be, Innovative should have been paying 4-5% in processing fees with a reserve of 5-10% and a hard cap on the reserve amount.  Instead, by the end of summer of 2023, Innovative was paying an average of approximately 7% in processing fees with reserves approaching 15% with no cap at all.   This cost Innovative hundreds of thousands of

dollars in excess processing fees and millions of dollars in inflated reserve requirements.

29. Behind the scenes, Motiwalla also began to process refunds through payment processors that had not initially processed the sale to spread around the refunds and deceive the processors into believing that their respective refund ratios were lower than they were.

30. Things only worsened from there, as the issues snowballed in late 2023. More processors either shut Innovative down due to volume or chargeback thresholds, or Motiwalla swapped those processors that threatened to shut Innovative down before they could do so. All in all, Motiwalla burned through a total of twenty (20) credit card processors while he was at the helm – a truly extraordinary number. By contrast, since Motiwalla's termination, Innovative has successfully used just two (2) processors over the past eight (8) months.

31. The situation reached a crescendo in February 2024, when Innovative was put on the MATCH list. MATCH stands for "Member Alert To Control High-risk merchants", and the list is a private, shared database used by global processors such as Visa and Mastercard to identify merchants who have been terminated from processing for serious violations, such as excessive chargebacks, fraudulent transactions, or PCI non-compliance. Being on the MATCH list makes it extremely difficult to obtain a new merchant account from other processors for a period of five years. As a result, Innovative's processing fees and reserve requirements increased even further, resulting in substantial losses to Innovative. It has also severely limited the pool of processors willing to work with Innovative and cost Innovative hundreds of thousands of dollars in attorneys' fees in an effort to get off the MATCH list.

32. With Innovative's principals in a panic, Motiwalla *appeared* to finally take real action to address this emergency. He assured Innovative's principals that this was not his fault and that he would be able to fix it. Motiwalla finally began implementing chargeback alerts, such as

16

RDRs, which calmed things a bit and allowed Innovative to hobble through its processing – jumping from processor to processor until they would find out about Innovative's MATCH list inclusion – until Motiwalla was terminated.

33.     But even during that period, with RDRs finally in place (albeit configured sub-optimally by Motiwalla), Innovative's charge attempt volume and chargeback ratios were still far in excess of card brand tolerances.   Innovative's principals would not learn why until shortly before it terminated him.

### C.     Motiwalla's Fraudulent Conduct is Brought to Light

34.     Motiwalla's incompetence was not the sole source of Innovative's credit card processing problems. Far from it.   Innovative ultimately learned that Motiwalla was engaging in fraudulent activities in his own Sales Room (Reia & Co), and his girlfriend's Sales Room (Atropine).

35.     Near the end of 2024, Innovative hired an outside consultant to help get Innovative off the MATCH list and assist Motiwalla in righting the ship.

36.     The consultant began an in-depth review of Innovative's processing history, scouring through reports and records across all Sales Rooms.   He discovered that Motiwalla was engaging in fraudulent conduct to enrich Reia & Co and Atropine.   For example, Innovative learned that Motiwalla used his unique access to Innovative's payment portals to manually recharge hundreds of Members' credits cards dozens of times (*up to 80 separate attempts per card, in some instances*) if the card had been declined or charged back on a sale made by Reia & Co or Atropine.   Motiwalla also manually reversed refunds intended for Members sold by Reia & Co and Atropine on transactions that were already approved to be refunded by Innovative's RDR systems.

17

37.     Because a small percentage of those transactions would eventually go through, this practice generated a few thousand dollars in revenue each month.  The purpose of Motiwalla's misconduct was thus to artificially inflate Reia & Co's and Atropine's sales numbers for as long as possible to, in turn, reduce their debit balances owed to Innovative and retain advances on Incentives that they knew they would never eventually earn.

38.     Shokry finally realized that Motiwalla was not just incompetent, but a fraudster. Innovative thus terminated Motiwalla as *de facto* COO on or about January 22, 2025.  By that time, Innovative had also shut off Reia & Co's and Atropine's access to Innovative's systems.

### D.     *Reia & Co's Breach of Recruiter Agreement and Debit Balance*

39.     By the time Innovative got around to serving Reia & Co and Motiwalla a formal notice of termination of Reia & Co's agreement with Innovative (the "Recruiter Agreement"), Reia & Co and Motiwalla (as personal guarantor) owed Innovative over $1.2 million dollars – Reia & Co's outstanding Debit Balance.  A true and correct copy of the Recruiter Agreement is attached hereto as Exhibit A, and a trued and correct copy of Innovative's letter of termination, dated May 29, 2025, is attached hereto as Exhibit B.[1]

40.     As noted above, Innovative prepaid its Recruiters Incentives six (6) months in advance, and Reia & Co was no different.  Pursuant to the Recruiter Agreement, Innovative had the discretion to advance, and did in fact advance, Incentive amounts to Reia & Co (called "Incentive Advances" or "Advance Incentives" in the Recruiter Agreement) – i.e., "a lump sum of money paid out to Recruiter … by Innovative … before the receipt of the Incentive, which otherwise would be paid monthly." Recruiter Agreement at ¶ 1(l); *see also id*. at ¶ 7(a). Pursuant

---

[1] Although not required under FRCP 5.2, Motiwalla's home address has been redacted from Exhibit B for privacy purposes.

to the Incentive Schedules, the advance was for six (6) months of Incentives.

41.     As Members paid monthly Plan Fees to Innovative, the Incentive amount applicable to such Plan Fees would be credited against the Incentive advances. *Id.* at ¶ 6(a).  Innovative would provide Reia & Co monthly statements showing the then-current Debit Balance – *i.e.*, "the amounts owed by Recruiter … to Innovative".  *Id*. at 1(i) and 6(b).  The Debit Balance was calculated by subtracting the aggregate sum of Incentives applicable to Plan Fees that Innovative actually received, from the aggregate sum of Incentive advances that Innovative pre-paid to Reia & Co.

42.     For purposes of calculating the Debit Balance, Incentive advances were aggregated such that Innovative was authorized to use any Incentive (or payable) that would otherwise be owed by Innovative to Atropine, as a credit against any outstanding Incentive Advance.  *See id.* at ¶ 7(b).  The Recruiter Agreement also authorized Innovative to apply Incentives otherwise payable to Reia & Co against the outstanding Incentive advance balance if Innovative determined that Reia & Co might not be unable to timely repay the Incentive advances amount "for any reason".

43.     If Motiwalla had operated Reia & Co's Sales Room honestly, ethically, and using sound business practices, cancellation rates by its enrolled Members should not have exceeded 10% on a month-over-month basis.  This is a concept known in the industry as "persistency".

44.     A poor persistency rate is a reliable indicator that a Recruiter is either incompetent, at best, or engaging in fraudulent or oppressive sales tactics, at worst.  Either way, the result is the same: an unexpectedly high number of early terminations before the 6-month mark, and, depending on the severity of the situation, a significant financial loss for Innovative, which has pre-paid Incentives on Plan Fees that it expected to receive but never will.

45.     Reia & Co was required under the Recruiter Agreement to maintain a healthy persistency rate, with cancellations not to exceed 10%, month over month.  *See id*. at ¶ 3(g).

19

46.     However, by the time of Reia & Co's termination for cause, formalized on May 29, 2025, it had very high Debit Balances and excessive cancellations, far exceeding the 10% threshold, resulting in a significant Debit Balance – $1,215.880.83 to be exact.   In hindsight, given what Innovative learned about Motiwalla's misconduct while acting as COO, this came as no surprise to Innovative.

47.     Under the Recruiter Agreement, upon a termination for cause "any Debit Balance owed to Innovative … shall be and is immediately due and payable."  *Id*. at ¶ 15(b).  Reia & Co thus owes Innovative the outstanding Debit Balance.

48.     To ensure Reia & Co's repayment obligations of any Debit Balance owed, Motiwalla also signed the Recruiter Agreement individually as a guarantor, to "unconditionally, personally, individually, jointly, and severally guarantee the performance of [Reia & Co] … under this Agreement and the payment and repayment of all sums due." *Id*. at ¶ 22.

49.     As of the filing of this Counterclaim, neither Reia & Co nor Motiwalla have repaid the Debit Balance to Innovative.

### E.     *Motiwalla Causes and Hides DOI Complaints from Innovative*

50.     As Motiwalla's Amended Complaint correctly indicates, Innovative received a cease-and-desist order from the California Department of Insurance in July 2025 (the "C&D Order").  What Motiwalla conveniently left out, however, is that he was personally named as a respondent in the C&D Order and that more than half of the lodged complaints that precipitated the C&D Order were from Members that Reia & Co and Atropine enrolled.

51.     Until that time, as far as Innovative knew, no department of insurance ("DOI") complaints had been made by Members recruited through Motiwalla and Bounahra's Sales Rooms.

52.     While DOI complaints should be rare in a well-run health plan organization, they

are inevitable when interacting with the public in this industry. They are more commonly associated with Sales Rooms with high Debit Balances. A high Debit Balance typically indicates an excessive cancellation rate, which correlates with lower customer satisfaction and, in turn, a higher risk of DOI complaints.

53. This made it surprising that Reia & Co's and Atropine's Sales Rooms were apparently not receiving DOI complaints during Motiwalla's tenure as *de facto* COO, given their high Debit Balances, prompting one of Innovative's other officers to ask Motiwalla directly about this. Motiwalla always maintained that no DOI complaint had ever been made by a Member recruited by Reia & Co or Atropine.

54. Innovative now knows Motiwalla was lying. In fact, Innovative later learned that Reia & Co and Atropine caused Innovative to receive several DOI complaints from Members, but because of Motiwalla's position with Innovative, these DOI complaints came directly to him. Rather than report the DOI complaints internally to Innovative's principals, Motiwalla hid their existence to protect himself and his girlfriend, Bounahra, so that they could continue to engage in wrongdoing to the detriment of Innovative and continue to receive Incentives. When Innovative failed to timely respond to the complaints that Motiwalla concealed, Innovative was faced with more scrutiny of various DOIs.

55. Because it does not yet have possession of Reia & Co's call recordings, the full extent of Motiwalla's fraudulent and deceptive conduct through Reia & Co is currently unknown to Innovative. However, upon information and belief, and in view of the allegations in the C&D Order and Reia & Co's incredibly high Debit Balance, Motiwalla likely directed his Sales Room to engage in the following unethical sales practices, among others:

      (a)     Misrepresenting Innovative's association with unrelated health plan

providers;

(b)     Misrepresenting to Members that they would only have to pay two (2) months of Plan Fees per year, and that the remainder of the year would be free; and/or

(c)     Misrepresenting available coverage for pre-existing conditions and certain medical procedures.

56.     Innovative also learned that Motiwalla owned a lead generation company, Nu Life Health LLC ("Nu Life"), that generated leads by sending text message "blasts" to the public. Apparently, Nu Life got sued for a violation of the Telephone Consumer Protection Act.

57.     Motiwalla, without notifying or obtaining permission from Innovative, asked legal counsel who normally represented Innovative to act on behalf of Nu Life in the TCPA lawsuit.  He then instructed Innovative to pay Nu Life's legal fees, which Innovative paid for under the mistaken belief that the expenses related to legal work performed for Innovative.

**COUNT I**
**Fraud**
**(against Motiwalla)**

58.      Innovative incorporates and re-alleges paragraphs 1 through 57 above as though fully set forth herein.

59.     Motiwalla affirmatively misrepresented material facts and concealed or failed to disclose material facts that he had a duty to disclose, including but not limited to:

(a)     Misrepresenting his expertise in business operations pertinent to Innovative, particularly in credit card processing in "card not present" environments;

(b)     Misrepresenting and concealing the existence of DOI complaints received from Members enrolled by Reia & Co and Atropine, even when asked directly;

(c)     Misrepresenting and concealing the true reasons Innovative was placed on

22

the MATCH list; and

(d)      Misrepresenting and concealing the true nature of legal fees and costs incurred in connection with Nu Life's TCPA litigation.

60.      Under the circumstances, Motiwalla had a duty to disclose this information because:

(a)      He possessed superior knowledge of his own qualifications, the DOI complaints, the reasons for Innovative's MATCH designation, and the nature of the Nu Life legal fees;

(b)      He knew Innovative was acting on mistaken assumptions; and

(c)      By making partial disclosures regarding these matters, Motiwalla created a duty to fully and truthfully disclose the facts.

61.      Motiwalla knew that his affirmative statements were false when made, or made them with reckless disregard for the truth, and he intended that Innovative rely upon them.

62.      Innovative justifiably and reasonably relied on Motiwalla's false statements and concealment. Specifically. Innovative relied on Motiwalla's misrepresentations and omissions in engaging him as *de facto* COO and entrusting him with management responsibilities and Innovative relied on his false statements and concealment regarding DOI complaints, the MATCH list, and Nu Life's legal fees in making business and financial decisions.

63.      As a direct and proximate result of Motiwalla's fraudulent misrepresentations and concealment, Innovative suffered damages, including but not limited to: additional processing fees, excessive reserve holds, and lost revenue resulting from placement on the MATCH list; attorneys' fees and costs incurred due to regulatory and processor scrutiny; and payment of legal fees that were not owed by Innovative.

WHEREFORE, Plaintiff INNOVATIVE PARTNERS L.P. demands judgment against Plaintiff Counter-Defendant, ARMAN MOTIWALLA, for actual damages in such amounts to be proven at trial and for such other relief as the Court deems just and proper.

**COUNT II**
**Conversion**
**(against Motiwalla and Reia & Co)**

64.     Innovative incorporates and re-alleges paragraphs 1 through 57 above as though fully set forth herein.

65.     Innovative owned, and had the immediate right to possess, specific and identifiable funds that were wrongfully diverted for the benefit of Reia & Co and Motiwalla.

66.     As a direct result of Motiwalla's practice of repeatedly processing declined credit cards and re-charging refunded transactions, Reia & Co received specific funds in the form of Incentives that were not earned or owed.

67.     Additionally, as a direct result of Motiwalla's misrepresentations and concealment regarding the nature of legal fees incurred on behalf of Nu Life, Innovative wrongfully paid specific and identifiable funds that were not owed by Innovative, for the benefit of Motiwalla and Nu Life.

68.     By engaging in this conduct, Reia & Co and Motiwalla wrongfully exercised dominion and control over Innovative's funds in a manner inconsistent with Innovative's ownership rights.

69.     Reia & Co and Motiwalla's wrongful conduct permanently deprived Innovative of these funds and caused it to suffer damages.

WHEREFORE, Plaintiff INNOVATIVE PARTNERS L.P. demands judgment against Plaintiff Counter-Defendant, ARMAN MOTIWALLA, and Counter-Defendant, REIA & CO LLC,

24

for actual damages in such amounts to be proven at trial and for such other relief as the Court deems just and proper.

## COUNT III
## Breach of Fiduciary Duty
## (against Motiwalla)

70.     Innovative incorporates and re-alleges paragraphs 1 through 57 above as though fully set forth herein.

71.     As noted above, Motiwalla refused to be a w-2 employee of Innovative and insisted on being engaged as an independent contractor through Huriya to avoid payment obligations to his ex-wife.

72.     However, at all relevant times, Motiwalla did act as the *de facto* COO of Innovative and was entrusted with managing its day-to-day operations, including, primarily, oversight of merchant accounts, credit card processing, customer disputes, and compliance functions.

73.     By virtue of this role, Motiwalla occupied a position of trust and confidence and owed fiduciary duties of loyalty, good faith, and due care to Innovative.

74.     Motiwalla accepted and undertook these fiduciary responsibilities, and Innovative justifiably relied upon him to act in Innovative's best interests.

75.     Motiwalla breached his fiduciary duties by, among other things:

(a)     Concealing DOI complaints from Innovative and lying about their existence;

(b)     Repeatedly charging declined credit cards, re-charging refunded cards, and cancelling approved refunds, which generated fraudulent revenue to Reia & Co and Atropine and caused additional expense and exposure to Innovative;

(c)     Diverting Innovative's funds to pay the legal fees of Nu Life Health, LLC

25

without authorization;

(d)     Favoring his own Sales Room, Reia & Co, and Atropine, owned by his girlfriend, Bounahra, for self-dealing purposes; and

(e)     Failing to implement proper and customary credit card processing safeguards, and engaging in fraudulent and unethical conduct described above, thereby causing Innovative to be terminated by processors, placed on the MATCH list and incur substantial damages.

76.     As a direct and proximate result of Motiwalla's breaches of fiduciary duty, Innovative suffered damages, including but not limited to: chargeback fees and increased processing costs; loss of access to credit card processing at standard market rates; loss of use of millions of dollars in held-back reserve funds; and legal fees improperly paid on behalf of Nu Life.

WHEREFORE, Plaintiff INNOVATIVE PARTNERS L.P. demands judgment against Plaintiff / Counter-Defendant, ARMAN MOTIWALLA, for actual damages in such amounts to be proven at trial and for such other relief as the Court deems just and proper.

### COUNT IV
### Breach of Recruiter Agreement
### (against Reia & Co)

77.     Plaintiff incorporates and re-alleges paragraphs 1 through 57 above as though fully set forth herein.

78.     Innovative, Reia & Co, and Motiwalla entered into the Recruiter Agreement, a valid and enforceable contract.

79.     Reia & Co materially breached the Recruiter Agreement by, among other things:

(a)     failing to maintain the contractually required persistency rate, as Reia & Co's cancellations from Participants well exceeded 10% month-over-month, *see* Recruiter

26

Agreement at ¶ 3(g), and

(b)     failing to pay Innovative the outstanding Debit Balance following termination of the Recruiter Agreement for cause, *see id*. at ¶ 15(b)(3).

80.     As a result of Reia & Co's breach, Innovative has suffered damages in the form of the unpaid Debit Balance and such other damages to be proven at trial.

81.     Innovative is entitled to recover its attorneys' fees and costs from Reia & Co pursuant to paragraph 18 of the Recruiter Agreement.

WHEREFORE, Plaintiff INNOVATIVE PARTNERS L.P. demands judgment against Counter-Defendant, REIA & CO LLC, for actual damages in such amounts to be proven at trial, for attorney's fees, court costs and for such other relief as the Court deems just and proper.

## COUNT V
### Breach of Recruiter Agreement
### (against Motiwalla)

82.     Plaintiff incorporates and re-alleges paragraphs 1 through 57, 78 and 79 above as though fully set forth herein.

83.     Motiwalla also executed the Recruiter Agreement in his individual capacity as Reia & Co's guarantor, agreeing to unconditionally, personally, individually, jointly, and severally guarantee the payment and repayment of all sums due thereunder.  *Id*. at ¶ 22.

84.     Motiwalla is thus jointly and severally liable with Reia & Co for the outstanding Debit Balance following termination of the Recruiter Agreement for cause.  *Id*. at ¶ 15(b)(3)).

85.     Motiwalla materially breached the Recruiter Agreement by failing to pay Innovative the outstanding Debit Balance following termination of the Recruiter Agreement for cause.

86.     As a result of Motiwalla's breach, Innovative has suffered damages in the form of

the unpaid Debit Balance and such other damages to be proven at trial.

87.     Innovative is entitled to recover its attorneys' fees and costs from Motiwalla pursuant to paragraph 18 of the Recruiter Agreement.

WHEREFORE, Plaintiff INNOVATIVE PARTNERS L.P. demands judgment against Plaintiff / Counter-Defendant, ARMAN MOTIWALLA, for actual damages in such amounts to be proven at trial, for attorney's fees, court costs, and for such other relief as the Court deems just and proper.

Date: <u>September 30, 2025</u>                    Respectfully submitted,


By: /s/ *Joshua L. Spoont*
Joshua L. Spoont
Florida Bar No. 53263
josh@sodhispoont.com
Eric M. Sodhi
Florida Bar No. 583871
eric@sodhispoont.com
Nathaniel M. Edenfield
Florida Bar No. 91034
nate@sodhispoont.com
Mauricio A. Torres
Florida Bar No. 1059067
mauricio@sodhispoont.com
**SODHI SPOONT PLLC**
3050 Biscayne Blvd., Ste. 701
Miami, FL 33137
Tel: 305-907-7573
*Counsel for Defendant / Counter-Plaintiff,*
*Innovative Partners, L.P.*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that the foregoing was filed on the CM/ECF system and that a

true and correct copy was served therefrom by e-mail on September 30, 2025 on all counsel or

parties of record on the service list below:

Benjamin H. Yormak
Florida Bar Number 71272
*Trial Counsel for Plaintiff*
Yormak Employment & Disability Law
27200 Riverview Center Blvd., Suite 109
Bonita Springs, Florida 34134
Telephone: (239) 985-9691
Fax: (239) 288-2534
Email: byormak@yormaklaw.com

/s/ *Joshua L. Spoont*
Joshua L. Spoont
Eric M. Sodhi
Nathaniel M. Edenfield
Mauricio Torres