**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
Case no.: 0:25-cv-61290-LEIBOWITZ

**ARMAN MOTIWALLA**, an individual,
    Plaintiff

v.

**INNOVATIVE PARTNERS L.P.**, a Texas
limited partnership,
    Defendants

_____

**INNOVATIVE PARTNERS L.P.**, a Texas
limited partnership,
    Counter-Plaintiff

v.

**ARMAN MOTIWALLA**, an individual
and **REIA & CO LLC**, a Delaware limited
liability company,
    Counter-Defendants

_____

**ARMAN MOTTIWALLA'S SECOND AMENDED AFFIRMATIVE DEFENSES**

1. **First Affirmative Defense. Unconscionability.**

The Recruiter Agreement executed July 17, 2023, is unconscionable and thereby void and/or unenforceable. The Recruiter Agreement was entered into in a fraudulent and misleading manner by Plaintiff and its principals/agents Ahmed Shokry and Christopher James Pagnanelli, who misrepresented that Defendants would not be responsible for debit balances and misrepresented payment terms including retention of residuals. The key provisions that Plaintiff relies upon were contrary to and/or minimized by Plaintiff's and its principals/agents' practices and representations. The relative bargaining power was one-sided with Plaintiff and/or its principals/agents having a form Recruiter Agreement that was on a take it or leave it basis. Defendants had no meaningful choice at the time the Recruiter Agreement was entered into on July 17, 2023. Further, the terms of Recruiter Agreement are unreasonable and unfair to an

outrageous degree, including unlimited personal liability provisions in Section 22, unilateral control over debit balance calculations under Section 6, 30-day objection periods under Section 6(c), and limitation of Plaintiff's liability to $50,000 under Section 9 while imposing unlimited liability on Defendants. Plaintiff and its principals/agents continued to misrepresent and fraudulently induce Defendants to continue doing business with Plaintiff.

**2.   Second Affirmative Defense. Fraud.**

a.   Inducement and Misrepresentations. Plaintiff's claims against Defendants fail, in whole or in part, due to fraud in the inducement and misrepresentation. Plaintiff, through its principals/ agents Ahmed Shokry and Christopher James Pagnanelli, induced Defendants to do business with Plaintiff by misrepresenting to Defendants the manner that they would get paid including retention of residuals, and the obligations regarding incentive/advanced commissions, specifically stating Defendants would not be responsible for debit balances. Plaintiff also misrepresented the support and role of Plaintiff and its customer service team. In reliance on Plaintiff's and its principals/agents' misrepresentations, Defendants began selling ERISA health plans for Plaintiff under the Recruiter Agreement executed July 17, 2023. These inducements and misrepresentations occurred prior to the Recruiter Agreement, subsequent to the Recruiter Agreement but before actually doing business together, and while doing business together to fraudulently keep Defendants working with Plaintiff and selling policies. Plaintiff's and its principals/agents' fraudulent inducement and misrepresentation bars any personal liability by the purported guarantor Defendant ARMAN MOTIWALLA under Section 22 of the Recruiter Agreement.

b.   Employee Retirement Income Security Act of 1974 ("ERISA") Fraud. Plaintiff, and its principals/agents Ahmed Shokry and/or Christopher James Pagnanelli, in violation of fiduciary duties and ERISA law, 29 U.S.C. Chapter 18 and 29 CFR § 2550.404a-1, improperly used and misappropriated plan funds and used the plan funds for the business and incentive/commission advances to Plaintiff's recruiters such as Defendants, and concealed same from Defendants. Further, 29 U.S.C. § 1109 requires any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries shall be personally liable to make good to such plan any losses to

the plan resulting from such breach, and to restore to such plan any profits such fiduciary which have been made through use of assets of the plan by the fiduciary. Therefore, Plaintiff and its principals/agents Ahmed Shokry and/or Christopher James Pagnanelli shall be personally liable to repay the improper advanced funds to Defendants as well as any ill-gotten gains they received. Defendants never agreed to be a part of Plaintiff, Ahmed Shokry, and Christopher James Pagnanelli's fraudulent and possibly criminal actions with ERISA plan funds, and never would have done business with Plaintiff had they known.

3. **Third Affirmative Defense. Illegality and Void as Against Public Policy.**

Plaintiff's claims fail, in whole or in part, because its principals and agents Ahmed Shokry and Christopher James Pagnanelli used misappropriated funds, including protected ERISA plan funds, to provide the very advancement funds to Defendants that Plaintiff now seeks to recover. As such, the Recruiter Agreement was an essential instrumentality of Plaintiff's illegal scheme and is therefore illegal, void, and unenforceable as a matter of law and public policy. This Court should not be used as an instrument to enforce a contract that is so closely intertwined with and in furtherance of an illegal enterprise.

4. **Fourth Affirmative Defense. Estoppel.**

Defendants reincorporate Affirmative Defense 2.a. as if stated fully herein. Plaintiff is estopped from trying to enforce provisions of the Recruiter Agreement that Plaintiff and its principals/agents Ahmed Shokry and Christopher James Pagnanelli previously advised Defendants otherwise about, including representations that Defendants would not be responsible for debit balances and misrepresentations about payment terms and customer service support. Defendants detrimentally relied and acted on these representations.

5. **Fifth Affirmative Defense. Prior breach.**

Plaintiff's claims fail, in whole or in part, because Plaintiff materially breached the Recruiter Agreement prior to any alleged breach by the Defendants. Plaintiff's prior breaches include, but are not limited to:

a. Violating the implied covenant of good faith and fair dealing by actively sabotaging Defendants' client relationships through poor customer service, encouraging clients to cancel their plans, encouraging clients to change their plans and move them to Plaintiff or an

affiliated entity, and failing to provide quality customer service, thereby making it impossible for Defendants to meet the "persistency" levels Plaintiff now cites as the basis for termination.

b.  Failing to provide accurate financial statements and manipulating the data used to calculate commissions and the purported "Debit Balance" of $1,215,880.83, in breach of its obligations under Section 6 of the agreement.

c.  Using the Recruiter Agreement as an instrument to further an illegal enterprise funded by misappropriated ERISA plan funds, which constitutes a breach of the entire agreement from its inception.

6.  **Sixth Affirmative Defense. Failure to mitigate damages.**

Plaintiff has failed to take reasonable steps to mitigate its alleged damages. Plaintiff at all times retained full control over benefit administration and customer service for the plans sold by Reia and Co. LLC under the Recruiter Agreement. Any damages Plaintiff claims in the form of a "Debit Balance" of $1,215,880.83 were directly caused or exacerbated by its own failure to provide adequate service and its active sabotage of client relationships through encouraging plan cancellations and failing to provide benefits, as alleged in Defendants' other affirmative defenses. Plaintiff cannot recover for damages that it could have reasonably avoided through competent and good-faith performance of its own duties.

7.  **Seventh Affirmative Defense. Failure of Conditions Precedent.**

Plaintiff's claims fail in whole, or in part, as Plaintiff failed to satisfy conditions precedent under Section 15(b) of the Recruiter Agreement, including, but not limited to failure to properly calculate and timely provide debit balances, provide accounting of collected premiums, and comply with termination procedures. Plaintiff shut off Reia & Co. LLC and its agents' access and ability to sell Plaintiff's products on or about August 30, 2024, without prior written termination for cause as required by the Recruiter Agreement, and then after a period of eight months deceitfully attempted to provide termination for cause on May 29, 2025. Plaintiff failed to timely provide a proper written termination for cause notice as required by Section 15(b) of the Recruiter Agreement.

8.  **Eighth Affirmative Defense. Waiver, Estoppel, and Laches.**

Plaintiff's claims are barred, in whole or in part, by the doctrines of waiver, estoppel, and laches. Plaintiff alleges a breach and/or termination occurred on or about August 30, 2024, when it shut off Reia & Co's access to Innovative's systems, but waited more than eight months, until May 29, 2025, to send a formal written notice terminating the agreement and demanding immediate repayment of $1,215,880.83. By failing to exercise its purported right to terminate and accelerate the debt in a timely manner, Plaintiff has waived that right as it relates to any attempt to state the August 2024 date controls for the date of termination. During this eight-month period from August 30, 2024 to May 29, 2025, Plaintiff continued to administer the book of business generated by Defendants and accept the benefits of premiums paid by these clients. Plaintiff's unreasonable and prejudicial delay bars its claim.

9. **Ninth Affirmative Defense. Contractual Waiver and Release by Subsequent Contract.**

Plaintiff's claims are barred by the express terms of the Commission Purchase Agreement ("CPA") executed by Plaintiff, Reia, and a third party, Advanced Plus, LLC, on or about July 24, 2023.

a. After executing the Recruiter Agreement on July 17, 2023, the parties entered into a subsequent, superseding agreement (the "CPA") on or about July 24, 2023, a true and correct copy of which is attached hereto as Exhibit "A".

b. This subsequent CPA explicitly states that in the event of a conflict with the prior Recruiter Agreement, the terms of the CPA "shall supersede any rights INNOVATIVE has under the [Recruiter Agreement]".

c. Pursuant to Section C(3) of the CPA, INNOVATIVE expressly "waived" its right to deduct from any of Defendants' compensation "any indebtedness or other amounts that may be due and owing by Producer to INNOVATIVE".

d. Furthermore, the subsequent CPA contains no personal guarantee by Defendant MOTIWALLA. By omitting the personal guarantee from the subsequent and superseding agreement governing the financial obligations, the parties extinguished any such guarantee that may have existed under Section 22 of the prior Recruiter Agreement.

e.  Because the parties' subsequent CPA supersedes the prior Recruiter Agreement, contains an express waiver of the claims asserted, and extinguishes any prior personal guarantee, Plaintiff's Complaint is barred as to all Defendants.

**10. Tenth Affirmative Defense. Plaintiff is Not the Real Party in Interest.**

a.  Plaintiff's claims are barred because Plaintiff is not the real party in interest to bring this action.

b.  Pursuant to the Commission Purchase Agreement ("CPA") executed on or about July 24, 2023, and attached as Exhibit "A", Plaintiff sold, assigned, and transferred its rights and interests with respect to the commissions and receivables at issue to a third party, Advanced Plus, LLC ("ADVANCE CO.").

c.  As a result of this sale and assignment under the CPA dated July 24, 2023, any claims related to the commission advances and the resulting debit balance of $1,215,880.83 now belong to ADVANCE CO., not the Plaintiff.

d.  Therefore, Plaintiff lacks standing to prosecute this action, which must be brought, if at all, by the real party in interest, ADVANCE CO.

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document is being served this day on Joshua L. Spoont, Eric M. Sodhi, Nathaniel M. Edenfield, and Mauricio A. Torres, Counsel for Defendant, via Service Email this 18th day of March, 2026.

**DATED MARCH 18, 2026**                                        **FOR PLAINTIFF:**

BY: */s/ G. Ware Cornell, Jr.*
G. Ware Cornell, Jr.
FBN: 203920
ware@warecornell.com
**CORNELL & ASSOCIATES, P.A.**
2645 Executive Park Drive
Weston, Fla. 33331
(954) 618-1041

# EXHIBIT A

## COMMISSION PURCHASE AGREEMENT

THIS COMMISSION PURCHASE AGREEMENT (this "Agreement") is entered into as of Jul 24 2023 12:22 "Effective Date"), between Reia & Co LLC_____("Producer"), Advanced Plus, LLC, ("ADVANCE CO.") and Innovative Partners LP ("Innovative") (collectively, the "Parties")

WHEREAS the Producer Agreement, entered into by Innovative and Producer, authorizes Producer, directly and through its Subbrokers, to solicit certain Insurance Products and submit the applications to Innovative, and to the extent Producer is entitled to commission compensation, Innovative may cause the commission compensation to be paid to Producer or directly to Producer's Subbroker. (Referred to herein as "Contract" and/or "Producer Agreement") A copy of the Producer Agreement is attached hereto as Exhibit A.

WHEREAS subject to the terms of this Agreement, the Producer desires to sell and ADVANCE CO. is willing to purchase from Producer the right to the payment of certain commissions which are expected to be earned by Producer pursuant to the Producer Agreement.

### A. DEFINITIONS

"Accounts" shall have the meaning set forth in Article 9 of the Uniform Commercial Code of the State of Florida.

"Affiliate" means any Person that directly or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person.

"Ancillary Product" means dental, vision, accidental death and dismemberment, life, critical illness, accident and medical expense, value added benefits, and any stand-alone ancillary telemedicine, discount medical provider organization programs, etc.

"Attrition Rate" means the percentage of policies that lapse or are cancelled each month.

"Broker of Record" means the natural person shown as licensed broker on the relevant application for an Insurance Product.

"Client" means any insured, policyholder, certificate holder, member, payor, or applicant for whom either Producer or a Subbroker is Broker of Record, and with respect to whom Innovative administers the applicable Insurance Product.

"Collections" means, with respect to any Receivable and Related Assets, all cash, or other payments thereon and other cash proceeds thereof, whether in the form of cash, checks, wire transfers, electronic transfers, or any other form of cash payment.

"Commission" means that percentage of commissionable premium related to Insurance Products specified on the commission schedule that Innovative has agreed to pay Producer pursuant to the Producer Agreement, and/or any Subbroker pursuant to any agreement between the Producer and the particular Subbroker, as such commission is assigned to Producer. For the

15403830.1/52888-00001

avoidance of doubt, in no event shall the term "Commission" include any commission or fee otherwise due to Innovative from the applicable association on account of the sale and issuanceof association membership which has been collected and deposited into the Operating Account (as such term is defined in the Servicing Agreement).

"Commission Purchase Price" shall have the meaning set forth in Section 2(a) hereof.

"Compensation" means collectively the Commissions of Producer as well as any Subbroker commissions assigned to Producer, over-rides, accounts receivable, service fees, incentives, bonuses, or any other amounts or proceeds payable under the Producer Agreement by Innovative to Producer on or after the Effective Date.

"Control" means the power, directly or indirectly to vote ten percent (10.00%) or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of a Person or direct or cause the direction of the management and policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

"Core Product" means anything tied to an insured medical product or health share product, e.g., including, but not limited to short-term medical, limited benefit, programs that provide preventative medical benefits, and healthcare sharing ministries.

"Eligible Insurance Company" means each insurance company approved by ADVANCE CO. in ADVANCE CO.'s sole discretion.

"General Intangibles" shall have the meaning set forth in in Article 9 of the Uniform Commercial Code of the State of Florida.

"Governmental Authority" means the government of the United States of America, any other nation, or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Insurance Products" means all insured products, which are products underwritten by an Eligible Insurance Company and eligible to pay a Commission to the Producer, and in each case, administered by Innovative. For the avoidance of doubt, non-insured and value added benefits which are not underwritten by an Eligible Insurance Company may also be eligible to pay a Commission to a Producer. In such case, the non-insured products may also be incorporated in this defined term.

"Maximum Attrition" means an Attrition Rate greater than ten percent (10.00%) per month in any given month.

"Maximum No Take Rate" means a No Take Rate of greater than twenty-five percent (25.00%) per month.

15403830.1/52888-00001

"No Take" means a policy sold under the Contract where the insured fails or refuses to keep the policy in force until the successful collection of the second (2nd) monthly payment/renewal (also known as P2 payment).

"No Take Amount" means the amount of Compensation that would have been due to the Producer on account of No Take policies.

"No Take Rate" means the percentage of policies sold under the Contract where the insured fails or refuses to keep the policy in force until the successful collection of the second (2nd) monthly payment/renewal (also known as P2 payment).

"Person" means any individual, partnership, firm, corporation, association, joint venture, sole proprietorship, limited liability company, estate, trust or other entity, or any Governmental Authority.

"Proceeds" shall have the meaning set forth in Article 9 of the Uniform Commercial Code of the State of Florida.

"Program Fee" means, collectively, that non-commissionable fee to Producer shall be $18 per member per month paid in perpetuity as long as the member policies (consisting of either a Core Product and/or an Ancillary Product) are active and paid policies and/or members.

"Purchased Commission Amount" means the Commission amounts identified on Exhibit "B" from time to time that are sold and assigned hereunder to ADVANCE CO.

"Receivable(s)" means Commissions that have been sold and assigned to ADVANCE CO. hereunder.

"Receivable File" means such information as ADVANCE CO. reasonably requests to identify and underwrite the Commissions which Producer seeks to sell to ADVANCE CO. hereunder. Such information shall include weekly cumulative funding report by agency and advanced balance with monthly earned by agency.

"Related Assets" means, with respect to any Commission or Receivable, any Related Property and all Collections with respect to such Receivable and any other Proceeds of such Receivable.

"Related Property" means, with respect to any Commission or Receivable, all of Producer's rights, title, interests, remedies, powers and privileges to the Proceeds purchased pursuant to this Agreement, all security interests or other liens and property subject thereto from time to time securing payment of such Commission or Receivable, if any, all deposit or other accounts into which any Collections are deposited or concentrated, all monies and other items of payment therein (but only to the extent relating to the Commission or Receivable), any other agreements or documents of whatever character from time to time supporting or securing payment of such Commission or Receivable, all Receivable Files and all other instruments and rights relating to such Commission or Receivable and all products and Proceeds of any of the foregoing.

15403830.1/52888-00001

"Representative" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

"Subbroker(s)" means any broker(s), agent(s), or other representative(s) of Producer who: has entered into an agreement with Producer, is authorized by Producer to submit applications for Insurance Products, and has assigned to Producer all his/her compensation due from Innovative.

"Twisting" means intentionally encouraging people who have purchased Insurance Products to switch their coverage to a product that is not an Insurance Product.

A.    **THIRD-PARTY BENEFICIARY OF THE PRODUCER AGREEMENT**

1.    The Parties acknowledge and make ADVANCE CO. a third-party beneficiary of the Producer Agreement, allowing ADVANCE CO. to enforce the Producer Agreement provisions on Producer's behalf against Innovative.

B.    **PAYMENT FOR PURCHASED COMMISSIONS: ASSIGNMENT OF RELATED ASSETS**

1.    Provided the Contract is in full force and effect at the time and subject to the terms contained herein, on and after the Effective Date, ADVANCE CO. and the Producer may periodically agree to the purchase from Producer of certain future Commissions and take assignment of the Related Assets for an agreed purchase price (the "Commission Purchase Price") in the amounts and at the time periods specified in the Commissions Purchase Request and its accompanying Schedules attached as Exhibit "B" hereto (the "Commissions Purchase Request") for the Insurance Products identified in the Commissions Purchase Request that Producer may become entitled to under the Contract. For the avoidance of doubt, Innovative shall not amend the commission schedule set forth in the Contract without the prior written consent of ADVANCE CO., which consent shall not be unreasonably withheld or delayed. In lieu of using the Commissions Purchase Request, the Parties may alternatively agree to an arrangement whereby Innovative provides ADVANCE CO. documentation confirming ACH (or other payment transfers) paid to Producers to identify the Commission Purchase Price and Insurance Products.

2.    The Commission Purchase Prices shall be payable only on sales of Insurance Products that are administered by INNOVATIVE on or after the Effective Date issued by an Eligible Insurance Company, and only where the collection and disbursement of premiums and other monies are administered by Innovative, as servicer.

3.    ADVANCE CO. has agreed to purchase up to six (6) months of Commissions in advance under the terms of this Agreement; *provided, that* ADVANCE CO. reserves the right to change the number of months of Commissions purchased in its sole and

absolute discretion. Any such changes shall be memorialized on the Commissions Purchase Request and/or any other mechanism designated by the Parties.

### C.    SALE OF COMMISSIONS

1.    The sale of Commissions and assignment of Related Assets as contemplated hereby are agreed to be a purchase and sale for all purposes under applicable law, and the Producer specifically agrees that it intends these transactions to be a purchase and sale and not a loan or extension of credit. Notwithstanding the terms and conditions set forth in the Contract, Innovative acknowledges and agrees that the purchases and assignments of Commissions and Related Assets as contemplated hereby are hereby irrevocably consented to by Innovative, and, if there is a conflict in the language set forth in the Contract and this Agreement, all rights purchased under this Agreement with respect to the Commissions and Related Assets shall supersede any rights Innovative has under the Contract.

2.    The Receivables shall be paid by Innovative directly to ADVANCE CO. from the Compensation payable to Producer under the Contract (including any Compensation assigned to the Producer by a Subbroker). All amounts due to Producer on account of Commissions shall be used to pay ADVANCE CO. the Purchased Commission Amount before any proceeds are paid to Producer on account of same.

3.    Innovative and Producer acknowledge and agree that, so long as Producer has any obligations to ADVANCE CO., any and all set-off rights that Innovative may otherwise be entitled to assert under the Contract or applicable law are hereby waived with respect to the payment by Innovative of the Receivables, including, but not limited to, any right of Innovative to deduct from any monies or Compensation due to Producer (or its assignee), or any indebtedness or other amounts that may be due and owing by Producer to Innovative. In furtherance of the foregoing, for so long as Producer has any obligations to ADVANCE CO., Innovative waives and releases any security interest and lien that Innovative may have via the terms of the Contract or otherwise, on any portion of the Receivable, the Receivable File, or any Proceeds thereof. Accordingly, for so long as Producer has any obligations to ADVANCE CO., Producer waives any rights it may have under the Contract or applicable law to claim or assert that any Collections or other funds received or held by Innovative or its Affiliates with respect to any Commissions are to be held in trust or escrow on behalf of Producer. This Section 3(c) shall exclude any and all reserves held by the merchant payment processor utilized by Innovative with respect to Collections received due to credit card chargeback rates (which are in force with the applicable underwriting bank) being higher than the industry threshold at the time of processing; *provided,* that any right, title and/or interest Innovative has in such funds relating to the Commissions and Related Assets shall be deemed to be held for the benefit of ADVANCE CO.

4.    If Producer allows any Subbroker to revoke the assignment to Producer of Subbroker's compensation due from Innovative, or to the extent that Subbroker is able to revoke such assignment, ADVANCE CO. may, in its sole option, immediately and permanently suspend its obligation to pay Commission Purchase Prices with respect to Insurance Product applications that are: (A) dated after the date of revocation of the assignment, and (B) on which that Subbroker is listed as Broker of Record.

5.      ADVANCE CO. shall not be required to purchase or accept the assignment of any Commissions and the Parties hereto agree that it has no obligation to do so.

6.      Producer may request a purchase of Commissions periodically, but no more frequently than weekly, by submitting the Commissions Purchase Request and the related Receivables File. Upon receipt of the Commissions Purchase Request and Receivable File, ADVANCE CO. shall notify Producer within three (3) business days if it elects to make the purchase of the Commissions being so tendered.

7.      Producer hereby assigns to ADVANCE CO. the purchased Receivables and conveys all right, title, and interest in, to, and under the purchased Receivables whether under the Contract or any other agreement, arrangement, or understanding, including, withoutlimitation, any agreement with the policy issuer without reservation of rights. For the avoidance of doubt, ADVANCE CO. owns the commission stream in perpetuity as long as the member policies (consisting of either a Core Product and/or an Ancillary Product) are active and paid policies and/or members

8.      The Commissions sold by Producer to ADVANCE CO. pursuant to this Agreement are Accounts or General Intangibles and such sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Commissions free and clear of any liens and encumbrances, from Producer to ADVANCE CO. The sale of the Commissions creates a security interest as defined in the UCC; (ii) this Agreement constitutes a "security agreement" under the UCC; and (iii) ADVANCE CO. has all the rights of a secured party under the UCC with respect to such Commissions. Without being in derogation of the Parties' intention that the sale of Commissions hereunder shall constitute a true sale thereof, the Producer hereby grants to ADVANCE CO. a valid and protected security interest (to the extent that such security interest can be perfected under the UCC) in all of the Producer's, including any such Producer's Subbrokers or Clients, right, title, and interest in, to and under all Commissions and Related Assets, now existing and hereafter arising, and all proceeds thereof, in which ADVANCE CO. has acquired, may hereafter acquire and/or purports pursuant to the terms and provisions of this Agreement to have acquired, an interest under this Agreement to secure performance of the obligations of the Producer hereunder. Producer represents and warrants that each remittance of collections and other property to ADVANCE CO. hereunder with respect to Commissions will have been made in the ordinary course of business or financial affairs of the Producer.

9.      In addition, in connection with any sale of the Commissions and assignment of Related Assets by Producer to ADVANCE CO., Innovative hereby agrees to pay to ADVANCE CO. the applicable Program Fees received in respect of Commissions and Related Assets purchased and assigned hereunder, and hereby assigns to ADVANCE CO. all right, title, and interest in, to and under such Program Fees whether under the Contract or any other agreement, arrangement, or understanding, including, without limitation, any agreement with the policy issuer without reservation of rights. Producer hereby releases any claim, right or entitlement to any portion of the Program Fees. The Program Fees shall be due and payable to ADVANCE CO. from Collections pursuant to the terms of the Servicing Agreement. The Parties hereto acknowledge and agree that ADVANCE CO. shall have all right, title and interest in, to and under such Program Fees for the life of the related Insurance Products.

10.     During the term of this Agreement, on request and during regular business hours, ADVANCE CO. may at its own expense inspect, or have its Representatives inspect and

audit Innovative's books, records, and other documents as necessary to verify compliance with the terms and conditions of this Agreement and related agreements. For the avoidance of doubt, ADVANCE CO. will have full access to the database and all raw data commencing on the effective date of this agreement.

**D.**     RIGHTS OF SET-OFF

1.     ADVANCE CO. shall have the right to set-off against Producer for any losses or deficiencies incurred by ADVANCE CO. due to the No Take Amount or Attrition Rate. For the avoidance of doubt, there will be no set-off against new policies written, but rather, the total fees and commissions will be remitted to ADVANCE CO. and ADVANCE CO. will make the necessary adjustments and remit funds back to Producer for the new policies written.

2.     The right of set-off shall apply to all amounts due to Producer under this Agreement and/or the Contract.

**E.     PAYMENT OF DOCUMENTARY STAMP OR OTHER TAXES DUE**

1.     Producer shall pay all documentary stamp or other tax due in connection with the execution and delivery of this Agreement and/or the purchase of Commissions hereunder.

**F.     REPRESENTATIONS AND WARRANTIES RESPECTING RECEIVABLES**

Producer represents and warrants to ADVANCE CO. on the Effective Date andon each closing date on which a Commission is assigned by Producer and purchased by ADVANCE CO. the following:

1.     By submitting a Receivable File to ADVANCE CO., Producer represents and warrants the following as to the corresponding Receivable:

i.     Producer has undertaken no action, agreement or understanding which would have the effect of limiting the truth, correctness, and accuracy of any of the facts, circumstances and dollar amounts set out in the Receivable File;

ii.     Producer has undertaken no action, including without limitation entering into an agreement or understanding with any Person, which would limit the enforceability of the Receivable or which would create an offset to the amounts due and payable pursuant to the Receivable;

iii.     No restriction, agreement, or understanding exists which would prevent the assignment or sale of any Receivable by Producer to ADVANCE CO.;

iv.     The contemplated sale and assignment of the Receivable will result in the acquisition by ADVANCE CO. (or its designee), of the sole right to hold and collect said Receivable, subject only to the terms and conditions of this Agreement;

v.     Except in favor of Innovative, to the extent expressly set forth in the Contract (but subject to the terms and conditions hereof), Producer has not previously assigned, encumbered, or granted any interest in the Receivable other than to ADVANCE CO.;

15403830.1/52888-00001

vi.     Producer knows of no reason why the Receivables will not be fully paid in a timely manner;

vii.     Producer has taken no action nor failed to take any action that would impair, compromise, or otherwise affect the collectability of the Receivable.

viii.     No fact, circumstance, or understanding exists which would render the sale or assignment of the Receivable to be illegal or fraudulent, or which could expose ADVANCE CO. to claims or accusations of having participated in any scheme or devise to injure or to defraud.

ix.     Producer, after diligent inquiry, has no reason to believe that the Attrition Rate will exceed the Maximum Attrition Rate in any monthly period.

x.     Producer, after diligent inquiry, has no reason to believe that the No Take Rate will exceed the Maximum No Take Rate in any monthly period.

xi.     The Contract does not contain any provision allowing Commission to be forfeited except in the event of actual fraud.

xii.     Producer will only perform the marketing services outlined in the Contract in states and jurisdictions where Producer is lawfully licensed and appointed to do so, and in states and jurisdictions where Innovative offers Insurance Products to the general public.

## G.     COVENANTS OF PRODUCER

1.     Producer hereby covenants that it will:

i.     Use its best efforts to manage and minimize the No Take Amount and the Attrition Rate.

ii.     Not engage in Twisting.

iii.     Not create, incur, or assume any additional indebtedness not existing as of the Effective Date.

iv.     Not assign or otherwise transfer any of its rights to any Commissions to any Person other than ADVANCE CO.

v.     Use commercially reasonable efforts to ensure that the Insurance Products remain in force for as long as possible.

vi.     Conduct its affairs in full compliance with the Contract and all applicable laws, regulations, and rules.

vii.     Maintain an Attrition Rate below the Maximum Attrition Rate.

viii.     Maintain a No Take Rate below the Maximum No Take Rate.

15403830.1/52888-00001

ix.	Producer and its employees, agents and sub-agents must be properly licensed and approved by Innovative and appointed by the relevant insurance carrier in the appropriate jurisdictions in accordance with applicable law prior to the commencement of any sales activity related to the Contract and this Agreement. Producer shall notify Innovative and ADVANCE CO. immediately upon learning of any expiration, termination, suspension, administrative action, or any other action or change in status by a Department of Insurance or any other governmental agency affecting said license or appointment.

x.	Producer agrees to obtain and maintain Errors and Omissions Insurance coverage from a carrier satisfactory to Innovative with minimum coverage limits of $1,000,000 per incident and $1,000,000 in aggregate, or such higher amounts as may be required by law or as determined by the Innovative. Upon Innovative's or ADVANCE CO.'s request, Producer shall provide certificates of insurance evidencing such coverage. Producer agrees to make best efforts to provide the Innovative and/or ADVANCE CO. with thirty (30) days prior written notice, and in any event will provide notice as soon as reasonably practicable, of any modification, termination, or cancellation of such coverage.

**H.	DEFAULT**

1.	Event of Default. An "Event of Default" under this Agreement shall mean any of the following:

i.	Any representation or warranty made by Producer or Innovative under this Agreement or under the Contract, is materially false or misleading at the time the representation is made;

ii.	Any Party to this Agreement breaches or otherwise violates any covenant of such Party, as applicable, under this Agreement or the Contract;

iii.	Any Party to this Agreement fails to comply with the terms of this Agreement or the Contract, as applicable; or

iv.	The Servicer fails to remit, when due, the Collections pursuant to the terms of the Servicing Agreement.

**I.	TERMINATION BY ADVANCE CO.**

1.	ADVANCE CO. may terminate this Agreement unilaterally with or without cause at any time by providing written notice to Producer in accordance with the notice requirements outlined herein. Notwithstanding the foregoing, ADVANCE CO. may terminate this Agreement immediately upon the occurrence of an Event of Default. If not earlier terminated, this Agreement shall terminate automatically upon termination of the Contract.

**J.	AUTHORITY**

1.	Producer is a LLC, duly organized, validly existing, and in good standing under the laws of the State of Delaware.

15403830.1/52888—00001

2.      Producer has all necessary company power and authority to enter into this Agreement and to perform all of the obligations to be performed by it under this Agreement. This Agreement has been duly executed and delivered by Producer and constitutes the valid and binding obligations of Producer, enforceable in accordance with its terms (except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, receivership, conservatorship, and the rights and obligations of receivers and conservators under the bankruptcy laws and other laws relating to or affecting creditors' rights generally and by general principals of equity).

3.      There is no claim, nor any litigation, proceeding, arbitration, investigation, or material controversy pending, against or affecting Producer which will have a material adverse effect on the Receivables to be assigned to ADVANCE CO. hereunder or the ability of Producer to consummate the transactions contemplated hereby and, to the best of Producer's knowledge, no such claim, litigation, proceeding, arbitration, investigation, or material controversy has been threatened or contemplated.

4.      To the best knowledge of Producer, there is no federal statute, rule or regulation, or order or rule of any federal regulatory agency, or statute, rule or regulation which would prevent Producer from consummating the transactions contemplated hereby.

## K.      ADDITIONAL ACTIONS

1.      As to each Purchased Commission Amount, ADVANCE CO. shall cause all documents which require filing in the office of any federal, state, or local government court oragency to be appropriately filed so as to perfect ADVANCE CO.'s ownership and title in the Purchased Commission Amount. Without limiting the generality of the foregoing, such filings shall include filing UCC-1 and any other applicable financing statements, which shall be filed in all applicable jurisdictions in order to perfect the security interest in any collateral or the proceeds thereof.

2.      Each of the Parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances, and provide such information and take such further actions and provide such information as may be reasonably requested to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement.

## L.      NOTICE PROVISIONS

1.      Any notice, request, instruction, or other communication to be given hereunder by a Party hereto shall be in writing and shall be deemed to have been given: when received if given in person or by a messenger or courier service; on the date of confirmed transmission if sent by email, facsimile, or other wire transmission; or three (3) business days after being deposited in the U.S. mail, certified or registered, postage prepaid, addressed as follows:

To: Producer:

Reia & Co LLC

444 NE 7th Street Fort Lauderdale FL 33304

15403830.1/52888-00001

ATTN:   Arman Motiwalla   
EMAIL:  info@reiaco.com   

To:  ADVANCE CO.:
Advanced Plus, LLC
99 Sunnyside Blvd. Ext.
Woodbury, NY 33071
Attn: Lisa Gioia Fallah
l.fallah@advancedplusllc.com


To:INNOVATIVE

Innovative Partners, LP
1401 N. University Dr. Suite 204
Coral Springs, FL 33071
Attn: Tiffany Bredeson
info@innovativepartnerslp.com

In the event any Party wishes to change its address or contract information for notices provided above, it shall promptly advise the other Party in writing, and any notice thereafter required to be given shall be sent in accordance with the change notice.

## M.   SUCCESSORS, ASSIGNS AND WAIVER

1.   This Agreement shall be binding upon and inure to the benefit of Producer and its respective representatives, heirs, Affiliates, successors and assigns. This Agreement may. not be assigned by Producer or Innovative without the prior written consent of ADVANCE CO. ADVANCE CO. may assign this Agreement and/or the Receivables and Related Assets purchased by ADVANCE CO. from Producer to any Affiliate, subsidiary, successors, assigns or other party without the prior consent of any other Party.

2.   The rights of any Party to enforce any provision of this Agreement shall not be affected by such Party's prior failure to require the other Party's performance under such provision or any other provision. No right under this Agreement shall be deemed to have been waived unless such waiver is in writing and signed by the Party making the waiver.

3.   This Agreement and its Exhibits, together with the Origination and Administration Agreement and the Servicing Agreement,  to which the Parties are also parties, sets forth the entire understanding of  the Parties as to its subject matter and supersedes  any and all prior agreements and understandings between the Parties, whether written or oral. This Agreement may not be modified or amended except in writing signed by the Parties hereto. Except as otherwise expressly provided for herein, this Agreement shall not inure to the benefit of, be enforceable by, or create any right or cause of action in any person other than Producer or ADVANCE CO.

15403830.1/52888-00001

## INDEPENDENT PARTY

**0.** At all times during the term of this Agreement, the relationship between the Parties hereto shall be that of independent parties engaged in a purchase and sale transaction.

## P. INVALIDITY

1. If any provision of this Agreement is held invalid or otherwise unenforceable, that provision shall be stricken from this Agreement, and the enforceability of the remaining provisions shall not be impaired.

## Q. DISPUTES

1. If, in the opinion of ADVANCE CO., it becomes necessary to employ counsel to enforce this Agreement or to protect the security for the same, Producer shall be responsible for all reasonable costs and legal fees incurred by ADVANCE CO. for related to such collection, enforcement or protection of security.

2. This Agreement shall be governed by and construed in accordance with the laws of the State of Texas without giving effect to its conflicts or choice of laws principles that would require the application of the laws of a jurisdiction other than the State of Texas.

3. Any dispute, controversy or claim arising out of, relating to or in connection with this Agreement, including the breach, termination or validity thereof, shall be finally resolved by final and binding arbitration before a single neutral arbitrator located in Dallas, Texas, and conducted under the applicable Commercial Arbitration rules of SAMS. The arbitrator shall have the exclusive power to rule on any challenge to its own jurisdiction or to the validity or enforceability of any portion of the agreement to arbitrate. The Parties agree to arbitrate solely on an individual basis, and that this agreement does not permit class or group arbitration or any claims brought as a plaintiff or class member in any class, group or representative arbitration proceeding. The arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding.
The arbitrator's award will be final and binding upon the Parties and judgment may be entered on the award. Each Party expressly waives its right to have any controversies, claims or dispute arising from or related to this Agreement decided by a court or jury. The Parties and the arbitrator will maintain in confidence the existence of the arbitration proceeding, all materials filed in conjunction therewith and the substance of the underlying dispute unless and then only to the extent that disclosure is otherwise required by applicable law.

4. EACH PARTY HEREBY WAIVES ITS RIGHT TO A JURY TRIAL IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING IN CONNECTION WITH ANY MATTER RELATING TO THIS AGREEMENT.

5. Where necessary to facilitate the reasonable interpretation of this Agreement, any reference to the singular herein shall also include reference to the plural, and any reference to the masculine herein shall also include reference to the feminine and neuter.

15403830.1/52888-00001

Zoho Sign Document ID: 3041BA23-KY6WQ6FKUSHGMTDQU-AFTWLRIOB4PRZDMOBGAUJYNMM

6.      The Parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to specific performance of the terms hereof, in addition to any other remedy to which they are entitled at law or in equity.

**R.      COUNTERPARTS**

1.      This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. Counterparts may be delivered via facsimile, electronic mail, or other transmission method, and any counterpart so delivered will be deemed to have been duly and validly delivered and be validand effective for all purposes.

This Agreement is accepted and agreed to by the Parties as evidenced by the signatures below.

INNOVATIVE PARTNERS LP,

By: *Tiffany Bredeson*

Name: Tiffany Bredeson
Title: Representative & Authorized Signatory

Dated: Jul 25 2023 11:20 EDT

PRODUCER:

By: *Arman Motiwalla*

Name: Arman Motiwalla
Title: Manager
Dated: Jul 24 2023 12:22 EDT

ADVANCED PLUS, LLC

By:_____
Name:
Title:

Dated;_____

15403830.1/52888-00001

Zoho Sign Document ID: 3041BA23-KY6WQ6FKUSHGMTDQU-AFTWLRIOB4PRZDMOBGAUJYNMM

Exhibit "A"
Copy of Contract

[See attached]

15403830.1/52888-00001

Zoho Sign Document ID: 3041BA23-KY6WQ6FKUSHGMTDQU-AFTWLRIOB4PRZDMOBGAUJYNMM

Exhibit "B"
Commissions Purchase Request

Reference is made to that certain Master Commission Purchase Agreement by and between Innovative Partners LP, a Texas limited partnership ("Innovative"), ADVANCE CO. and Producer dated on or about Jul 24 2023 12:22 EDT ("the Agreement"). Capitalized terms used but not defined hereinshall have the meaning set forth in the Agreement.

Producer hereby submits the Commissions set forth on attached Schedule B-1 for sale as contemplated by the Agreement.

Innovative hereby represents and warrants to ADVANCE CO., that, to Innovative's knowledge after inquiry, the Commissions set forth on the attached Schedule B-1 by Innovative to Producer are valid and owing Commissions by Innovative to Producer under the Contract.

INNOVATIVE PARTNERS LP,

By: _Tiffany Bredeson_____

Name: Tiffany Bredeson

Title: Representative & Authorized Signatory

Dated. Jul 25 2023 11:20 EDT

PRODUCER:

By: _Arman Motiwalla_____

Name:  Arman Motiwalla

Title:  Manager

Dated. Jul 24 2023 12:22 EDT

ADVANCE CO.

By:_____     Dated: _____

Name:

Title:

15403830.1/52888-00001

Zoho Sign Document ID: 3041BA23-KY6WQ6FKUSHGMTDQU-AFTWLRIOB4PRZDMOBGAUJYNMM

*[Exhibit "B"]*

15403830.1/52888-00001

<u>Schedule B-1</u>

[Form of Commission Schedule]

[See attached]

15403830.1/52888-00001